**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANTHONY PUNTILLO and MARY CAROL PUNTILLO, | |
| Plaintiffs, | Case No. 15 CV 11839 |
| v. | Judge Harry D. Leinenweber |
| DAVE KNECHT HOMES, LLC, DAVID J. KNECHT, and KAREN M. KNECHT, individually and as Trustee of the KAREN M. KNECHT TRUST, | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Anthony and Mary Carol Puntillo (collectively "Plaintiffs" or the "Puntillos") and Defendants Dave Knecht Homes, LLC, David J. Knecht, and Karen M. Knecht, individually and as Trustee of the Karen M. Knecht Trust (collectively "Defendants") cross-move for summary judgment. Plaintiffs also move to strike most of Defendants' Statement of Facts and some of Defendants' Statement of Additional Facts. Defendants also move to exclude the expert opinion testimony of G. Scott Solomon. For the reasons stated herein, Plaintiffs' Motions to Strike (Dkt. Nos. 75, 92) are denied. Defendants' Motion to Exclude Expert Testimony (Dkt. No. 88) is denied. Plaintiffs' Motion for Summary Judgment (Dkt. No. 65) is granted in part and denied in part, and Defendants'

Motion for Summary Judgment (Dkt. No. 69) is granted in part and denied in part.

## I. <u>UNDISPUTED FACTS</u>

For convenience of the reader, the Court provides both a succinct summary and a more detailed overview of the facts. The following facts are undisputed unless designated otherwise.

This case arises from a dispute between the Puntillos and a housing development company, Northridge Builders, Inc. ("Northridge"), over the construction of a luxury home. Apparently, Northridge constructed a home for the Puntillos that was riddled with defects. In response, the Puntillos filed suit against Northridge in state court and received a judgment of monetary damages. Northridge however dissolved, and the Puntillos were unable to enforce that judgment against it. In the wake of it all, a new housing development company, Dave Knecht Homes, LLC, was created with allegedly very similar, if not the same, owners, management, staff, resources, and so forth. The crux of this lawsuit is whether the Puntillos can enforce the Northridge judgment against the newly developed Dave Knecht Homes.

### A. Northridge Builders, Inc.

Northridge specialized in building high-end custom homes and maintained its office at 15 Spinning Wheel Road in Hinsdale, Illinois. (Defs.' Resp. to Pls.' Stmt. of Facts ("PSOF") ¶ 5, Dkt. No. 79.) Defendant David J. Knecht was President and Director of

Northridge, as well as its sole shareholder since Northridge's inception until October 2008. (PSOF ¶ 6.) Defendant Karen M. Knecht is David Knecht's wife and the trustee of Defendant Karen M. Knecht Trust (the "Trust"). (PSOF ¶ 8.) Karen and David (collectively the "Knechts") are the beneficiaries of that Trust. (*Id.*) The Trust instrument provided that if stock or an ownership interest in Northridge is included in trust assets, the trustee—Karen Knecht—shall entrust to herself the management of Northridge. (*Id.*) On October 24, 2008, David Knecht transferred his shares in Northridge to the Trust. (PSOF ¶ 9.) While Plaintiffs contend there was no consideration for this transfer, Defendants assert that David transferred his personal property, not corporate property, to the Trust. (*Id.*) Following the transfer, David Knecht continued to serve as President and Director of Northridge. (PSOF ¶ 10.) The parties dispute, however, given the instructions of the Trust instrument, whether Karen or David Knecht was to have managerial authority over Northridge. (*Id.*) Northridge also made cash distributions directly into a bank account owned by David and Karen Knecht, but the parties dispute the amounts of those distributions. (PSOF ¶11.)

For the most part, Northridge was a successful and profitable business. (PSOF ¶ 27.) From December 2003 through to May 2012, Northridge was a party to more than thirty-three contracts for the construction or renovation of single-family custom homes. (PSOF

3

¶ 26.) These contracts had a value of approximately $50,229,000.00. (*Id.*) Northridge had gross revenues of over twelve million dollars in 2008; over eight million in 2009 and 2010; over seven million in 2011; and over ten million in 2012. (PSOF ¶ 27.) Then, between 2012 and 2013, Northridge incurred approximately $1,128,000.00 in expenses, which were personal to the Knechts and included federal and state income tax payments; landscaping, pool and retaining-wall work at the Knechts' personal residences; premiums for personal insurance policies; fees owed to the Knechts' personal attorneys; interior design fees; and automobile registration fees for Karen Knecht's personal vehicle. (PSOF ¶¶ 16-17.) After the fact, Northridge, through David Knecht, classified these expenses as shareholder "dividends" or "distributions." (PSOF ¶ 19.) The Knechts paid for these expenses using American Express cards issued to Northridge, which paid the interest owed for such expenses. (PSOF ¶ 20.) On January 20, 2014, David and Karen Knecht ratified the wind-down of Northridge's business affairs. (PSOF ¶ 28.) And on September 11, 2015, the Illinois Secretary of State effectively dissolved Northridge. (PSOF ¶ 30.)

David and Karen Knecht said they closed Northridge for several reasons, including that David "was burned out on the business" and that the two of them intended to move to Alabama. (PSOF ¶ 33.)

However, the Knechts never moved to Alabama nor ceased participating in the home building business. (*Id.*)

### B. Dave Knecht Homes, LLC

Dave Knecht Homes, LLC was organized on October 17, 2012, in the state of Illinois. (PSOF ¶ 22.) Its principal office is located at 15 Spinning Wheel Road in Hinsdale, Illinois, and its initial members were David Knecht and Mario Cirignani. (*Id.*) From January to May 2013, Dave Knecht Homes hired all of the people working for Northridge at the time, except for Karen Knecht. (PSOF ¶ 23.) Dave Knecht Homes hired Northridge's accountant, Anthony Recchia, to serve as its accountant. (*Id.*) It also contracted with approximately 115 subcontractors, tradesmen, suppliers, and other vendors that had formerly contracted with Northridge. (PSOF ¶ 39.) Dave Knecht Homes even displayed photographs of numerous homes constructed by Northridge. (PSOF ¶ 40.)

From October 2012, to January 2013, prior to hiring Northridge's employees, Dave Knecht Homes was a party to fifteen contracts having a total value of approximately $22,800,000.00. (PSOF ¶ 36.) From March 2013, to May 2017, Dave Knecht Homes was a party to forty more contracts having a total value of approximately $49,153,085. (PSOF ¶ 37.) All of those contracts involved work relating to the construction or renovation of single-family custom homes. (*Id.*) Dave Knecht Homes recorded at least $5,179,000.00 in revenue from clients who were former customers of

Northridge. (PSOF ¶ 38.) It had gross revenues in the amount of $2,524,172.00 in 2013; $8,223,305.00 in 2014; and $11,002,918.00 in 2015. (PSOF ¶ 41.) The combined total annual revenue of Northridge and Dave Knecht Homes was never less than $5.2 million. (*Id.*)

Northridge and Dave Knecht Homes utilized the same credit line. Beginning in 2006, Dave Knecht began using a personal credit line provided by Morgan Stanley to fund Northridge's business operations. (PSOF ¶ 42.) The credit line authorized Northridge to borrow up to $618,000.00 from Morgan Stanley in David Knecht's name. (*Id.*) Northridge, in fact, first borrowed $400,000.00 from this credit line on January 10, 2006. (*Id.*) It kept track of the funds it borrowed on the credit line by using a handwritten ledger, which tracked disbursements as well as repayments to the line. (PSOF ¶ 43.) In 2012, Ocwen Loan Servicing became the servicing lender on David Knecht's credit line. (*Id.*) According to the ledger, Dave Knecht Homes utilized this same credit line. (PSOF ¶ 44.) For example, Dave Knecht Homes borrowed $100,000.00 from the credit line in December 2014, and made a repayment of $200,000.00 in April 2015. (*Id.*)

### C. The Underlying Incident

In June 2006, Plaintiffs contracted with Northridge for the construction of a luxury custom home in Chesterton, Indiana. (PSOF ¶ 5.) After moving into their new home, Plaintiffs noted problems

6

with the structure, including cracks in the walls and floors, as well as an inability to operate certain doors and windows. (PSOF ¶ 7.) They communicated these problems to Northridge, apparently to no avail. (*Id.*)

On August 22, 2011, Plaintiffs' attorneys at the time sent David Knecht and Northridge a written notice of a construction defect claim under Indiana's New Home Construction Warranty Act. (PSOF ¶ 13.) David Knecht responded, informing Plaintiffs that his insurance company would deny the claim. (*Id.*) At the time, Northridge maintained a policy of Commercial General Liability (CGL) insurance with Cincinnati Insurance Company, but not any form of "builders' risk" insurance. (*Id.*) On January 18, 2012, Plaintiffs sued Northridge in the Superior Court of Porter County, Indiana, asserting a single claim for breach of warranty in connection with Northridge's construction of the Chesterton home. (PSOF ¶ 15.) In that case, Plaintiffs presented evidence that their home had subsided because it had been built on unsuitable soils, and that the subsidence had caused numerous problems with the home, including the cracks in the walls and floors and inability to operate certain windows and doors. (PSOF ¶ 24.) On December 10, 2003, the Porter Superior Court entered a judgement for Plaintiffs in the amount of $800,835.00. (PSOF ¶ 25.)

Between the start and end of that litigation, on October 5, 2012, Northridge's insurer, Cincinnati Insurance Company, sued

Northridge and Plaintiffs in the Circuit Court of Cook County, Illinois. (PSOF ¶ 21.) The case was removed to this District. (*Id.*) The Insurance Company sought declaratory judgment that Plaintiffs' claim against Northridge was not covered by Northridge's CGL insurance policy. (*Id.*) Judge Shadur entered an Order granting that declaratory relief. *See Cincinnati Ins. Co. v. Northridge Builders, Inc.*, No. 12 C 9102, 2015 WL 5720256 (N.D. Ill. Sept. 30, 2015).

Northridge never paid the $800,835.00 judgment. (PSOF ¶ 47.) Dave Knecht testified that he never paid that amount because he believed that insurance—either Northridge's, the Puntillos', the project architects', or the soils engineer's—covered the judgment. (*Id.*) However, neither Northridge nor the Puntillos asserted any claims against the project architects or the soils engineer. (*Id.*)

### D. The Instant Litigation

Based on the foregoing, the Puntillos brought this suit, claiming that Defendants should be held liable for paying the $800,835.00 judgment against Northridge. The Puntillos pursue three separate theories of liability: (1) Count I: fraudulent transfers; (2) Count II: successor liability; and (3) Count III: piercing the corporate veil. Both sides now move for summary judgment. Plaintiffs move for summary judgment as to Counts I, II, and III, and Defendants move for partial summary judgment as to Counts I and III of the Complaint. The Puntillos also move to

8

strike most of Defendants' statements of facts, and Defendants move to exclude the expert opinion testimony of G. Scott Solomon.

As a preliminary matter, the Court will address the Puntillos' Motions to Strike Defendants' Statements of Facts. The facts underlying summary judgment proceedings are drawn from the parties' Local Rule 56.1 submissions. This Rule assists courts "by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (internal quotation marks omitted). It is designed, in part, "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation marks omitted).

Local Rule 56.1(a)(3) requires a movant "to submit a statement of material facts that, according to the movant, entitles that party to judgment as a matter of law." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000); Local Rule 56.1(a)(3). The statement must (1) be limited to facts and not opinions or arguments; (2) state only *material* facts; and (3) include only facts supported with a citation to admissible evidence. *Malec*, 191 F.R.D. at 583.

For the most part, Plaintiffs argue that Defendants recite facts that are irrelevant and thus immaterial to the instant lawsuit. As laid out above, the Court includes and considers facts here relevant only to the issues and claims before it. As such, the Court need not give further thought to Plaintiffs' motions to strike certain of Defendants' statements of facts and thus denies those motions as moot.

Now the Court will turn to the merits of this case, considering first the admissibility of the expert opinion testimony before evaluating the Puntillos' three theories of liability.

## II.   **ANALYSIS**

### A.   **Expert Opinion Testimony**

Exclusion of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides that a qualified witness—one with the appropriate knowledge, skill, experience, training, or education—may testify in the form of an opinion if "(a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid.

702. To determine whether the opinion is admissible under this Rule, the Court must consider whether (1) the witness is qualified; (2) the expert's methodology is reliable; and (3) the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

Rule 702 is "flexible." *Daubert*, 509 U.S. at 594. The Court must make sure not to abrogate the role of the jury as it examines the admissibility of the evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). In particular, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In other words, "[d]eterminations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Finally, the proponent of testimony bears the burden of persuading the Court that the proffered testimony should be admitted. *Lewis v. CITGO Petroleum Corp.*, 461 F.3d 698, 705 (7th Cir. 2009).

G. Scott Solomon is the Puntillos' financial expert. He is a Certified Public Accountant with Charles River Associates in

11

Chicago. (G. Scott Solomon Decl. ¶ 3, Ex. 6 to Pls.' Mot. for Summ. J., Dkt. No. 65-6.) Solomon has provided accounting, auditing, and financial and dispute-related services for 18 years. (*Id.*) He is also Certified in Financial Forensics and a Certified Fraud Examiner. Plaintiffs retained Solomon to opine on factors that a trier of fact can consider when deciding successor liability, including indicia of fraudulent transfers, and whether to pierce the corporate veil. (Solomon Decl. ¶ 1.) Solomon opined that Northridge and Dave Knecht Homes operated with similar management, ownership, financing, personnel, locations, and general business operations, and Northridge received little, if any, consideration for the transition of the foregoing from one company to the other. (Solomon Decl. ¶ 20.) He further opined that Northridge and Dave Knecht Homes commingled funds, and Northridge customers transitioned to Dave Knecht Homes. (*Id.*) With respect to David Knecht, Karen Knecht, the Trust, and Northridge, Solomon opined that they all commingled funds, that there were transactions between them that "are not arm's length," and that Northridge "paid distributions, personal expenses, and outstanding loans benefiting Defendants" to the detriment of the Puntillos securing their judgment. (*Id.*)

Defendants argue that Solomon's testimony should be excluded because Solomon: (1) offers contradictory statements; (2) renders opinions that do not require specialized knowledge; (3) improperly

usurps the role of the fact finder; and (4) provides testimony that is cumulative and unnecessary. The Court will consider these arguments separately.

Defendants offer numerous examples of Solomon allegedly providing contradictory statements. First, Solomon recognized that, unlike Northridge, Mario Cirignani is a fifty percent owner of Dave Knecht Homes. (*See* G. Scott Solomon Dep. 60:1-10, Ex. 1 to Defs.' Mot. to Strike Solomon Test., Dkt. No. 88-1.) Defendants assert this recognition contradicts Solomon's opinion that Northridge and Dave Knecht homes operated with similar ownership. Second, Solomon concluded that Cirignani's borrowing of funds from Dave Knecht's line of credit has "no apparent business purpose" and was "not an arm's length transaction." (Solomon Dep. 62:19-23.) Defendants assert this conclusion contradicts Solomon's later statement that there was nothing wrong with the transaction if Cirignani was personally obligated. (Solomon Decl. ¶ 30; Solmon Dep. 65:2-3.) Third, Solomon opined that Northridge and Dave Knecht Homes operated at similar locations, but then admitted that the two operated from different suites. (*See* Solomon Decl. ¶ 41.) Fourth, Solomon claimed that Northridge and Dave Knecht Homes improperly commingled funds since employees continued to use Northridge credit cards after their last dates of employment with Northridge, yet later admitted that it was unclear whether those

charges were for Northridge or Dave Knecht Homes. (Solomon Decl. ¶ 54.)

The foregoing alleged contradictions go to the weight, not reliability, of Solomon's testimony. *See In re Fluidmaster, Inc., Water Connector Components Prod. Liabl. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *23 (N.D. Ill. Mar. 31, 2017) (citing *Smith*, 215 F.3d at 718 (7th Cir. 2000)). For purposes of admissibility, reliability "is primarily a question of validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or conclusion produced." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (quoting *Smith*, 215 F.3d at 718).

Moreover, the alleged contradictions are illusory. For example, there is no dispute that Dave Knecht was and is an owner of both Northridge and Dave Knecht Homes, with a management role in both companies. That finding could have formed the basis of Solomon's opinion that Northridge and Dave Knecht Homes operated with similar ownership, regardless of Cirignani owning fifty percent of Dave Knecht Homes. Another example is Defendants' alleged contradiction about the companies occupying different

14

suites in the same building. Neither party disputes that both Northridge and Dave Knecht Homes had their principal offices at 15 Spinning Wheel Road in Hinsdale, Illinois. The fact that their offices were in different suites does not contradict the conclusion that they were in a similar location—*i.e.*, the office building. The alleged contradictions fail to rise to the applicable legal standards regarding expert testimony. Accordingly, Defendants' argument fails.

Defendants' second and third arguments—that Solomon's opinions do not require specialized knowledge and that he has usurped the role of fact finder—fare no better. To admit expert testimony, the expert must use his specific, specialized knowledge of the subject matter to assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; s*ee also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017). As explained above, Solomon has extensive experience in financial forensics and holds various certificates to demonstrate his qualifications. In conducting his analysis, Solomon sifted through and analyzed a vast array of documents produced through discovery, including tax returns, financial statements, general ledger data, loan documentation, credit card statements, and so forth. (Solomon Decl. ¶¶ 4-5.) Solomon traced the history of the parties' dispute and the financial origins and development of both Northridge and Dave Knecht Homes to reach his

conclusions. To further support his findings, Solomon provided fourteen schedules containing detailed calculations that he asserts helped him to reach his conclusions.

The crux of Defendants' argument is that Solomon's conclusions do not require specialized knowledge and, instead, can be derived through common sense. For example, Defendants point to the fact that Northridge and Dave Knecht Homes maintained their office in the same building. This fact led Solomon to conclude that the two entities operated with similar locations. While such a determination is commonsensical, Solomon's conclusion does more than just connect the dots. Solomon is also identifying factors for the trier of fact to consider in reaching the ultimate conclusions regarding liability. He relies on his specialized knowledge in the area to identify which transactions and facts are relevant to consider. As such, his proffered opinions "advance[ ] the inquiry." *Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006). Moreover, Solomon has not usurped the role of the finder of fact. While he has identified factors to guide the jury, he has steered clear from expressing opinions on the ultimate issues of this case: a determination on the Puntillos' claims for fraudulent transfers, successor liability, and piercing the corporate veil. Accordingly, Defendants' second and third arguments miss the mark.

Finally, Defendants argue that Solomon's testimony is cumulative and unnecessary under Federal Rule of Evidence 403. This argument was raised in Defendants' reply brief, which failed to give the Puntillos adequate opportunity to respond. Thus, the argument is waived. *Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir. 2010).

For the foregoing reasons, Defendants' motion to exclude Solomon's expert opinion testimony is denied. The Court will consider next the parties' cross-motions for summary judgment.

### B. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Liu v. T&H Mach., Inc.*, 191 F.3d 790, 794 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering the Puntillos' Motion for Summary Judgment, the Court construes the facts in the light most favorable to Defendants, and when considering Defendants' Motion for Summary Judgment, the Court construes the facts in the light most favorable to the Puntillos. *See First State Bank of*

*Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

### 1. Count I: Fraudulent Transfer

The Illinois Uniform Fraudulent Transfer Act ("IUFTA") enables creditors to defeat a debtor's transfer of assets to which the creditor was entitled. 740 ILCS 160/5; *see Rush Univ. Med. Cntr. v. Sessions*, 980 N.E. 2d 45, 51 (Ill. 2012). The IUFTA supplements common law principles of "law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause[.]" 740 ILCS 160/11. Under the IUFTA, a transfer is fraudulent as to a creditor if the debtor made the transfer:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either
>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a). Illinois recognizes two categories of fraudulent transfers: "fraud in law" and "fraud in fact," with the two distinguished by "whether the transfer was supported by

consideration." *Reagan v. Baird*, 487 N.E. 2d 1028, 1033 (Ill. App. Ct. 1985). A "fraud in law" transfer is one that is made for no or inadequate consideration. *Id.* In such a case, the "fraud is presumed" and "intent is immaterial." *Anderson v. Ferris*, 470 N.E. 2d 518, 521 (Ill. App. Ct. 1984) (citation omitted). Conversely, where "actual consideration has been given for the transfer and a specific intent to defraud" has been proven, such transfer constitutes "fraud in fact." *Id.*

The Puntillos claim that both types of fraudulent transfers are present in this case. They assert that Defendants fraudulently transferred from Northridge to Dave Knecht Homes the "goodwill, business methods and know-how, business contacts, intellectual property, and the custom home-building business itself (with associated corporate opportunities)." (Pls.' Mot. for Summ. J. at 11, Dkt. No. 67.) Moreover, the Puntillos contend no consideration was paid for this transfer. Defendants respond by arguing that they cannot mount a proper defense since they are unsure of what the Puntillos are claiming constitute fraudulent transfers. They point out that, aside from cash, Northridge did not have substantial assets such as equipment, inventory, intellectual property, and commercial paper that could have been transferred. As for any distributions that Dave Knecht Homes received, Defendants contend that it gave adequate consideration. For example, with David Knecht specifically, Defendants argue David

contributed capital towards Northridge, and Northridge received new clients as the source of its new business. However, Defendants point out that David Knecht had an at-will employment relationship with Northridge. Given that relationship, Defendants argue that David's "goodwill and ability to generate business is uniquely his and based on his personal reputation" and thus could not have been transferred. (Defs.' Mot. for Summ. J. at 15, Dkt. No. 69.) As such, no consideration was required.

The Court finds Defendants' first point persuasive. It is unclear what exactly the Puntillos are claiming as fraudulent transfers. Instead, the Puntillos vaguely and generally assert that most everything related to Northridge had been transferred to Dave Knecht Homes, and that those transfers were likely fraudulent due to the judgment Northridge owed to the Puntillos. In other words, the Puntillos have merely restated the applicable rules as conclusions specific to the facts of this case. That does not suffice. *See United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011) ("Undeveloped and unsupported arguments may be deemed waived."). This Court is not obliged to research and construct legal arguments for the parties, especially when they are represented by counsel. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The Puntillos also briefly mention "the many transfers to the Knechts through the direct payment of personal expenses." (Pls.'

Reply to Pls.' Mot. for Summ. J. at 5, Dkt. No. 84.) This point, however, was raised in Plaintiffs' reply brief. Since Defendants did not have an adequate opportunity to respond, the argument is waived. *Judge*, 612 F.3d at 542. It bears mentioning though that the specification is still undeveloped since the Puntillos do not do much by way of elaborating on its significance or relevance to the applicable standards. Summary judgment is the "put up or shut up moment" in litigation. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Plaintiffs have neither put up enough evidence nor raised adequate arguments to establish that a reasonable jury could find that fraud in fact or fraud in law occurred. Defendants are thus entitled to judgment as a matter of law on Count I.

### 2.    Count II: Successor Liability

Generally, a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. *Nilson v. Cont'l Mach. Mfg. Co.*, 621 N.E. 2d 1032, 1034 (Ill. App. Ct. 1993). There are, however, four exceptions to this general rule of successor corporate nonliability: (1) where an express or implied agreement of assumption exists; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping

liability for the seller's obligations. *Vernon v. Schuster*, 688 N.E. 2d 1172, 1176-77 (Ill. 1997). Relying on the latter two exceptions, the Puntillos argue that Dave Knecht Homes is a "mere continuation" of Northridge, and that Dave Knecht Homes was created for the "fraudulent purpose" of escaping liability for Northridge's obligations. The Court finds that the continuation exception is dispositive of the instant matter, so it need not consider the fraudulent purpose exception.

The continuation exception applies when the purchasing corporation is "merely a continuation or reincarnation of the selling corporation." *Vernon*, 688 N.E. 2d at 1176 (citation omitted). In other words, the purchasing corporation "maintains the same or similar management and ownership, but merely wears different clothes." *Id.* (internal quotation marks and citation omitted). The Illinois Supreme Court made clear that "[t]he [continuation] exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of the reach of the predecessor's creditors." *Id.* (citation omitted). To determine whether one corporate entity is a continuation of another, courts consider "whether there is a continuation of the corporate *entity of the seller*—not whether there is a continuation of the *seller's business operation*." *Id.* (emphasis in original). A common identity of officers, directors, ownership, and stocks between the selling and purchasing

22

corporation is a key element of what constitutes a continuation. *Id.*; *see also Dearborn Maple Venture, LLC v. SCI Ill. Servs., Inc.*, 968 N.E. 2d 1222, 1234 (Ill. App. Ct. 2012), *as modified on denial of reh'g* (May 29, 2012).

Here, there is no doubt that the two home development companies share many similarities. The main question is, however, whether those similarities constitute a "continuation" for purposes of liability. Defendants predominately rely on *Vernon v. Schuster*, 688 N.E. 2d 1172 (Ill. 1997), to argue that such liability is unwarranted. In *Vernon*, the owner of a sole proprietorship, Diversey Heating, passed away and his son continued the business. *Vernon*, 688 N.E. 2d at 1174. The plaintiffs in that case subsequently sued the son for a debt owned by Diversey Heating. *Id.* However, the court found against imposing liability because, despite finding that the nature of the business remained the same, the ownership of the business changed when the father passed away. *Id.* at 1177.

Defendants' reliance on *Vernon* is misplaced. In *Vernon*, there was no allegation of fraud, no transfer of assets from one company to another, and no evidence that any such transfer in ownership was intended to avoid a judgment of liability. Moreover, the facts in *Vernon* are distinguishable. The court in *Vernon* did not consider the identity of officers, directors, or stockholders, which is relevant and even crucial in determining continuity in the instant

matter. Thus *Vernon* is not particularly useful for considering the instant matter.

Here, David Knecht exercised ownership over both Dave Knecht Homes and Northridge at one point as a shareholder. David Knecht later turned over his shares in Northridge to the Karen M. Knecht Trust, the beneficiaries of which were both he and his wife, Karen. Defendants argue that Karen Knecht, not David Knecht, exercised managerial authority over Northridge, since the Trust instrument provided as much. But the fact that Karen Knecht is the trustee of the Trust does not render the continuation exception fatal. *See Steel Co. v. Morgan Marshall Indus., Inc.*, 662 N.E. 2d 595, 600 (Ill. App. Ct. 1996) (finding continuity of shareholders where wife of shareholder of predecessor corporation gratuitously received 80% of shares and husband acted as chief executive officer in successor corporation). The Court "cannot allow the law to be circumvented by an individual exerting control through his spouse. A creditor's rights cannot be cut off by a corporation which merely puts on a new coat." *Id.* While David Knecht assigned his shares to the Trust, he continued to serve as Northridge's President and maintained an executive position.

Soon after the Puntillos filed suit against Northridge in 2011, Defendants organized Dave Knecht Homes, LLC in Illinois. In that alleged successor company, Dave Knecht owns 50% of the shares, while Mario Cirignani owns the other half. Defendants point to the

fact that Cirignani was not involved in the ownership or management of Northridge as demonstrative of a lack of continuity between Northridge and Dave Knecht Homes. Nevertheless, "the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporation." *Workforce Solutions v. Urban Servs. of America, Inc.*, 977 N.E. 2d 267, 285 (Ill. App. Ct. 2012) (citation omitted); *Park v. Townson & Alexander, Inc.*, 679 N.E. 2d 107, 110 (Ill. App. Ct. 1997). Moreover, "[a] change of shareholders is consistent with mere continuation as long as the former owners retain a controlling interest in the successor entity." *Pielet v. Pielet*, 942 N.E. 2d 606, 688 (Ill. App. Ct. 2010), *aff'd in part, rev'd in part on other grounds*, 978 N.E. 2d 1000 (Ill. 2012). Thus, Cirignani's involvement in ownership and management is beside the point. There is no doubt that David Knecht retains a considerable, even controlling, interest in Dave Knecht Homes, LLC. As such, the identity of ownership and management between Northridge and Dave Knecht Homes is sufficiently similar and weighs heavily in Plaintiffs' favor for finding a continuation.

And there are more similarities between the two housing development companies that are important to note. Both companies are general contractors that derive revenue from building and renovating luxury homes. Dave Knecht Homes hired the project managers and other persons formerly employed by Northridge. It

also contracted with the same suppliers, material-men, and subcontractors as Northridge for its construction projects. Dave Knecht Homes is headquartered in the same building where Northridge was headquartered. The successor company even utilizes the same credit facility as Northridge, controlled by David Knecht, to finance its operations. Based on the foregoing, it is evident that David Knecht Homes is a continuation or reincarnation of Northridge. *See Dearborn Maple Venture, LLC*, 968 N.E. 2d at 1234 (finding successor liability where company shared common ownership and purpose of developing real property with predecessor company); *Kennedy v. Four Boys Labor Serv., Inc.*, 664 N.E. 2d 1088, 1094 (Ill. App. Ct. 1996). Accordingly, the Puntillos are entitled to judgment as a matter of law on Count II.

### 3. Count III: Piercing the Corporate Veil

The Puntillos also claim that Northridge served as an "alter ego" for the Knechts, and as such, the Court should pierce the corporate veil of Northridge and impose individual liability against the Knechts.

Under Illinois law, "a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Fontana v. TLD Builders, Inc.*, 840 N.E. 2d 767, 775 (Ill. App. Ct. 2005). This doctrine imposes liability on the individual or entity that "uses a corporation merely as an instrumentality to

conduct that person's or entity's business." *Id.* at 775-76 (citation omitted). Liability arises from "fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation." *Peetoom v. Swanson*, 778 N.E. 2d 291, 295 (Ill. App. Ct. 2002).

In Illinois, courts use a two-prong test to determine whether to pierce the corporate veil: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Fontana*, 840 N.E. 2d at 776. The party seeking to pierce the corporate veil has the burden of making a "substantial showing that one corporation is clearly dummy or sham for another." *In re Estate of Wallen*, 633 N.E. 2d 1350, 1357 (Ill. App. Ct. 1994).

Defendants first argue that this case is a breach of contract case, and as such, the Puntillos have a greater burden to establish liability. Courts apply a more stringent standard in contract cases to determine when to pierce the corporate veil. *Salatech, LLC v. East Balt. Inc.*, 20 N.E. 3d 796, 806 (Ill. App. Ct. 2014). This is because "a party seeking relief for a breach of contract presumably entered into the contract with the corporate entity voluntarily and knowingly and expecting to suffer the consequences of the

limited liability status of the corporate form." *Id.* Where there is "no evidence of any misrepresentation, no attempt to conceal any facts, and the parties possess a total understanding of all of the transactions involved, Illinois courts will not pierce the corporate veil in a breach of contract situation." *Tower Inv'rs, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E. 2d 927, 942 (Ill. App. Ct. 2007). However, Defendants are misguided. This is not a breach of contract case. It is about the alleged fraudulent transfer of assets from one company to another in an attempt to immunize the original company from an adverse judgment.

As Plaintiffs correctly identify, *A.L. Dougherty Real Estate Management Co., LLC v. Su Chin Tsai*, 98 N.E. 3d 504 (Ill. App. Ct. 2017), *appeal denied*, 95 N.E. 3d 497 (Ill. 2018), is instructive here. In that case, the plaintiff, a commercial landlord, obtained a default judgment for breach of a lease it had with a corporation called March Fasteners, Inc. ("March"), owned by the defendant Su Chin Tsai. *Id.* at 508. During the pendency of the litigation for that judgment, Su Chin Tsai transferred March's asset to another defendant corporation he organized, called Cube Global, LLC ("Cube"). *Id.* at 509. The plaintiff then sued Su Chin Tsai and Cube, alleging both alter ego and fraudulent transfer claims. *Id.* At trial, the plaintiff's forensic account established that Su Chin Tsai transferred all of March's assets, including inventory, accounts receivable, employees, contracts, vendor relationships

and business good will to Cube without consideration. *Id.* at 511.
Su Chin Tsai had also taken substantial distributions directly
from both of the corporations. *Id.* The court ultimately concluded
that Cube was the alter ego and mere instrumentality of the first
corporation, March, and was thus liable, along with Su Chin Tsai,
for the judgment against March. *Id.* at 517. That ruling was
affirmed by the Illinois Appellate Court, which rejected the same
breach of contract argument Defendants now raise. *Id.*

As was the case in *A.L. Dougherty*, the activities at issue
here are the Knechts' alleged attempts to transfer assets to avoid
a judgment. Plaintiffs point to extensive financial documents and
forensic analysis that the Knechts exercised control over
Northridge and treated the company's assets as their own, causing
Northridge to pay significant sums of money for their own personal
expenses. These expenses included federal and state income tax
payments; landscaping for their personal residences; personal life
insurance premiums; attorney's fees; and a $167,274 payment to a
title company to refinance the Knechts' personal residence in
Hinsdale. (PSOF ¶¶ 11, 17, 20.) Moreover, the Knechts had
Northridge pay their personal expenses using David Knecht's credit
line. Northridge also borrowed hundreds of thousands of dollars
from this credit line, all of which was tracked in a handwritten
ledger. Northridge eventually repaid the balance owed on the credit
line, but this repayment left Northridge with diminished assets,

29

valuing far less than what was owed to the Puntillos for their judgment. By causing Northridge to pay their significant personal expenses, the Knechts treated Northridge's assets as their own, to the detriment of the Puntillos. Therefore, as was the case in *A.L. Dougherty*, piercing the corporate veil of Dave Knecht Homes is appropriate. Plaintiffs are entitled to judgment as a matter of law as to Count III.

### III. CONCLUSION

For the reasons stated herein, Plaintiffs' Motions to Strike (Dkt. Nos. 75, 92) are denied. Defendants' Motion to Exclude Expert Testimony (Dkt. No. 88) is denied. Plaintiffs' Motion for Summary Judgment (Dkt. No. 65) is granted as to Counts II and III and denied as to Count I, and Defendants' Motion for Summary Judgment (Dkt. No. 69) is granted as to Count I and denied as to Counts II and III.

Plaintiffs have two weeks to set forth their claim for damages; Defendants then have two weeks to file their objections. The Court will rule on the damages issue by mail.


_____
Harry D. Leinenweber, Judge
United States District Court

Dated:   5/24/2019